COURT OF APPEALS
DECISION
DATED AND FILED

August 11, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP1657-CR**

Cir. Ct. No. 2022CF295

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT I

---

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

  V.

RUTHES CHESTER HOLEYFIELD,

    DEFENDANT-APPELLANT.

---

APPEAL from a judgment and an order of the circuit court for Milwaukee County: MARK A. SANDERS and LAURA CRIVELLO, Judges. *Affirmed*.

Before Donald, C.J., Colón, P.J., and Geenen, J.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   Ruthes Chester Holeyfield appeals from a judgment of conviction and a circuit court order denying his postconviction motion for a new trial.  A jury found Holeyfield guilty of repeated sexual assault of a child.  In a postconviction motion, Holeyfield alleged that the State violated the ***Brady*** rule[1] when it failed to disclose the forensic interview videos of Kalen and Ayla, the siblings of the victim Daria,[2] because those interviews were favorable and material to the defense.  On appeal, Holeyfield raises the same arguments under ***Brady***.

¶2     We conclude that the State did not violate the ***Brady*** rule.  While the State concedes that the interviews of Kalen and Ayla were "inadvertently suppressed," and it appears to concede on appeal that Kalen's interview arguably contains favorable impeachment evidence, Holeyfield failed to show that the interviews were material to the defense under ***Brady***.  Accordingly, we affirm the judgment of conviction and order denying Holeyfield's postconviction motion.

## BACKGROUND

¶3     On January 21, 2022, the State charged Holeyfield with one count of repeated acts of sexual assault of a child.  According to the complaint, Daria told a forensic interviewer that when she was living with her aunt, between July 2019 and July 2020, Holeyfield, her uncle, "would make her go into the basement and force penis to vagina sexual intercourse on her several times" per week, with each assault lasting between fifteen and twenty minutes.

---

[1] ***Brady v. Maryland***, 373 U.S. 83, 87 (1963).  In ***Brady***, the Supreme Court held that a defendant has a due process right to any favorable evidence material to either guilt or punishment that is in the State's possession, including any evidence which may impeach one of the State's witnesses.  ***State v. Wayerski***, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

[2] We use pseudonyms to refer to the children involved in this case.

¶4      In the forensic interview, Daria stated that she was eleven years old when she and her siblings were placed with her aunt in the summer of 2019.[3]  She also explained that the children's clothes were kept in the basement in baskets, and the children were responsible for keeping them organized.  Daria met Holeyfield for the first time around July 4, 2019.  He usually slept in the basement on a cot.

¶5      Daria told the interviewer that the first assault happened when Holeyfield called her into the basement by saying that her basket of clothes was messed up and she had to fix it.  In the basement, Holeyfield tried to kiss her.  She remembered that she was "scared" and that he was "really tall and really big."  He then pushed her onto the cot, pulled his pants partially down, and forced his penis inside her vagina as he covered her mouth and told her to be quiet.  Daria said the "first time" he could not get his penis "all the way" into her vagina even though he tried to "shove it in."

¶6      Daria stated that Holeyfield would subsequently make her go into the basement and force penis to vagina sexual intercourse the same way he did the first time.  In later assaults, there were times "where it did go in" and "it was hurting but not as bad as the first time."  The assaults persisted for approximately one year.  Sometimes Holeyfield would assault her twice a day and several times per week.  The assaults only happened in the basement, and they did not happen every day.  She stated that each assault lasted about ten to fifteen minutes.  She did not tell her aunt because Daria remembered that her mother was not believed when she disclosed her own sexual assault to her aunt, leading Daria to assume that her aunt

_____

[3] The circuit court noted that "it appears from the context of the [forensic] interview that [Daria] was placed with her aunt either on a CHIPS order or under the supervision" of the Division of Milwaukee Child Welfare (DMCW).  DMCW was formerly known as the Division of Milwaukee Child Protective Services.

would likewise doubt her story. During the interview, she appears reluctant to repeat embarrassing anatomical words such as "penis" and "vagina."

¶7 Daria also explained that, in July 2020, she got into an argument with her aunt, and Daria told her aunt that she no longer wished to live there; after involving a social worker, Daria went to live with a foster mother. Daria stated that although she was happy that she did not have to see Holeyfield anymore, she was sad to be separated from her siblings. During her time in foster care, Daria's foster mother repeatedly told Daria that she suspected that Daria was the victim of sexual abuse. Eventually, Daria told her what happened with Holeyfield. The foster mother reported the assaults to the DMCW and brought Daria to the forensic interview.

¶8 After Daria's allegations were reported, Holeyfield turned himself in, and in January 2022, the State charged him with repeated sexual assault of a child.

¶9 The case was tried by a jury. At trial, the State called forensic interviewer Lauren Lycan as a witness. Lycan explained the procedures she used to record and conduct the interview of Daria. She explained the concept of "delayed disclosure" of sexual assaults, which refers to the phenomenon that child victims of sexual assault often perceive that the barriers to disclosure (such as feelings of embarrassment or complex family dynamics) outweigh the factors that encourage disclosure, leading them to delay reporting abuse. During Lycan's testimony, the State presented the video of her interview with Daria.

¶10 After the video was played, the State called Daria to testify. On direct examination, Daria answered a few introductory questions from the State. Daria became upset when the State began questioning her about the assaults, and after a short recess, the State ended its examination. On cross-examination, defense

counsel asked Daria about whether "some of the things you said happened before didn't really happen[.]" She said she "didn't say that," that she "remember[ed] more things," and there were "probably things [she] left out and didn't tell the [interviewer]." Pressed about why she did not tell her aunt about the abuse, Daria answered, "Okay. Me and my aunty didn't get along. That's her brother. Who[se] side is she going to take?" She also testified that she was mad at Holeyfield for assaulting her but had no other reason to be upset with him. She testified that her siblings were home during the assaults but never came downstairs and that she continued to go downstairs because her clothes were kept there. The jury ultimately found Holeyfield guilty.

¶11     Four months after trial, the circuit court granted Holeyfield's motion to proceed pro se, and ordered the State to provide Holeyfield with discovery. The State filed an affidavit that listed the items of discovery delivered to Holeyfield, and among the listed items were the forensic interview videos of Daria's siblings, Kalen and Ayla.

¶12     Postconviction counsel was later appointed, and with the assistance of counsel, Holeyfield moved for a new trial on the ground that the State violated the *Brady* rule because the State suppressed the videos of Kalen's and Ayla's interviews, which he argued were both favorable and material to the defense. Postconviction counsel informed the court that Holeyfield's trial counsel had not received the videos of Kalen's and Ayla's interviews. The State conceded that the forensic interviews were "inadvertently suppressed" but argued that there was no *Brady* violation because the evidence was not favorable or material to the defense.

¶13     In his interview, Kalen, who was then thirteen years old, told the interviewer that Holeyfield slept in the basement on a cot. He stated that he was

"always" with Holeyfield and no one was ever alone with Holeyfield. When asked if anyone went into the basement with Holeyfield, Kalen said, "No, actually." However, he immediately clarified that when they would go into the basement, Holeyfield was sometimes already there talking on the phone. Kalen also stated that Holeyfield was never left alone in the house without another adult. However, he also stated that when their aunt left the house, either he or his cousin would watch the children. When asked if Daria spent time with Holeyfield, Kalen stated that they did not do that much together, although they were close. Kalen also stated that before Daria left her aunt's home, she had asked if she could live with Holeyfield, and this caused Kalen to think that something was not adding up about the later-disclosed assault allegations. When Kalen was asked about how he felt about Daria's claims, he stated that "it's going to hurt my family either way," and said, "I don't know if she's lying or not." "If she's lying ... that's going to be bad, but if she's not lying, that's going to be even worse."

¶14 Ayla was ten years old at the time of her interview. She stated that Holeyfield would ask the children to clean up their clothes in the basement. She said that she did not think there were times when Daria was downstairs alone with Holeyfield, and Daria "wouldn't be down there as much because she didn't really want to." When Daria went downstairs, Ayla or another sibling went too.

¶15 The circuit court denied the motion on the ground that Holeyfield failed to show that the videos were favorable and material. It characterized Kalen's "somewhat contradictory remarks"—that he was *always* following Holeyfield but that he sometimes went to the basement and found him there—as "a 13[-]year-old's description of routine household patterns" and not a contradiction of Daria's "statements about her and [Holeyfield] being alone together in the basement during the specific times the assaults occurred." It similarly viewed Ayla's statements as

6

"do[ing] more to confirm that [Holeyfield] was in the basement with the children at times, including [Daria], than they do to cast doubt on [Daria's] statements" about being alone with him at the time of the assaults. The circuit court therefore concluded that the State did not violate ***Brady*** because the suppressed statements were neither favorable nor material to the defense.

¶16    Holeyfield appeals.

### DISCUSSION

I.    **Holeyfield failed to prove that Kalen's and Ayla's forensic interview videos were material to the defense.**

¶17    Holeyfield argues that the State violated the ***Brady*** rule because the State suppressed the forensic interviews of Kalen and Ayla, and these interviews were both favorable and material to the defense. When we review a ***Brady*** claim, we accept the circuit court's factual findings unless clearly erroneous but independently review whether a due process violation occurred. ***State v. Wayerski***, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468.

¶18    "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." ***Brady v. Maryland***, 373 U.S. 83, 87 (1963). A ***Brady*** violation has three components: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material. ***Wayerski***, 385 Wis. 2d 344, ¶35. The State explicitly concedes that the evidence was inadvertently suppressed, and on appeal, it appears to concede that Kalen's statement that Daria asked to live with Holeyfield could be construed as favorable

7

impeachment evidence. We therefore focus on the third component of a ***Brady*** violation, i.e., whether the evidence is material.

¶19 Under ***Brady***, evidence is material "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" ***Wayerski***, 385 Wis. 2d 344, ¶61 (citation omitted). In determining materiality, the suppressed evidence is not considered on its own but is instead evaluated "in the context of the entire record[.]" ***Turner v. United States***, 582 U.S. 313, 324-25 (2017) (citation omitted). The defendant bears the burden of proving the components of a ***Brady*** violation. ***State v. Harris***, 2004 WI 64, ¶13, 272 Wis. 2d 80, 680 N.W.2d 737.

¶20 Because there is no reasonable probability that the result of the proceedings would have been different had Kalen's and Ayla's interviews been disclosed, we conclude that the suppressed interviews are not material.

¶21 The key factual question in this case is whether Daria and Holeyfield were ever alone together in the basement for the time it took Holeyfield to assault her. Holeyfield argues that both Kalen's and Ayla's interviews discredit Daria's claim that she was frequently alone with Holeyfield in the basement.

¶22 Specifically, Holeyfield points to Kalen's response of "no, actually" when asked whether anyone went into the basement with Holeyfield. However, Kalen immediately clarified that when they would go into the basement, Holeyfield was sometimes already there talking on the phone. We agree with the circuit court that Kalen's statement that he was "always" with Holeyfield somewhat contradicts his statement that there were times when he went into the basement to find that Holeyfield was already there, indicating that Kalen was not "always" with Holeyfield. Additionally, although Kalen stated that Holeyfield was never left alone

8

in the house without another adult, he also stated that either Kalen or his cousin would watch the children when his aunt would leave the house, indicating that there were times when no other adult was in the home with the children and Holeyfield. We agree with the circuit court that Kalen's somewhat contradictory remarks are best understood as a thirteen-year-old's description of routine household patterns and do not materially contradict Daria's statements about her and Holeyfield being alone together in the basement during the specific times the assaults occurred.

¶23 Moreover, while it appears at times in the interview that Kalen is aware and somewhat skeptical of Daria's claims, he also expressed concern that "it's going to hurt my family either way," and said, "I don't know if she's lying or not." "If she's lying ... that's going to be bad, but if she's not lying, that's going to be even worse." Far from providing material exculpatory or impeachment evidence, these statements reflect Kalen's uncertainty regarding the truth of the allegations.

¶24 Similarly, Ayla stated that she did not think there were times when others were downstairs alone with Holeyfield and that Daria would not go into the basement as much because she did not want to. When Daria went downstairs, Ayla or another sibling went too. However, Ayla also stated that there were times that Holeyfield would direct the children to clean up their clothes in the basement. We agree with the circuit court that these comments from Ayla's forensic interview do more to confirm that Holeyfield was sometimes in the basement with the children, including Daria, than to cast doubt on Daria's statements that she and Holeyfield were alone in the basement at the time of the assaults. They do not materially contradict or impeach any of the particulars of Daria's statements.

¶25 Holeyfield also points to Kalen's statement that when Daria was about to leave their aunt's household, she asked to live with Holeyfield, and this caused

Kalen to think that something was not adding up about the later-disclosed assault allegations. However, the suppressed evidence is not considered on its own. Whether suppressed evidence is material is evaluated "in the context of the entire record[.]" *Turner*, 582 U.S. at 324-25 (citation omitted). Viewing the record as a whole, we agree with the State that Kalen's statement that Daria once asked to live with Holeyfield does not outweigh the multitude of facts supporting Daria's credibility, and therefore, it cannot be said that the evidence is reasonably probable to change the result of the trial.

¶26 For example, Daria's description of the first assault included the detail that Holeyfield's penis would not "go all the way in" even though he kept trying to "shove it in." She said that in later assaults, there were times "where it did go in" and "it was hurting but not as bad as the first time." She remembered that she was "scared" and that Holeyfield was "really tall and really big." These details are consistent with the real experience of an eleven-year-old who knew the physical difference between a first sexual assault and subsequent sexual assaults. She also recalled that his pants were "down but not all the way off." This detail tracks with other details of the assaults (i.e., that these were quick assaults, lasting approximately fifteen minutes and for which Holeyfield did not fully undress).

¶27 Other facts in the record further reinforce Daria's credibility. She appears reluctant to repeat embarrassing words such as "penis" and "vagina," and that visible discomfort is consistent with a child using "anatomical words." The record also shows that it was Daria's belief, based on specific knowledge from her mother, that she would not be believed if she told her aunt what was happening. Daria stated that although she was happy that she did not have to see Holeyfield anymore, she was sad to be separated from her siblings, and there is no evidence that she used the disclosure to gain any advantage; she remained in foster care,

separated from her siblings who remained at her aunt's house. The circumstances of her disclosure—not made immediately after leaving her aunt's home for foster care—are consistent with Lycan's testimony regarding delayed disclosure.

¶28 Holeyfield generally asserts that Daria's direct and cross-examination testimony lacked detail, and because the State's case turned on Daria's credibility, any evidence which contradicted or impeached her account necessarily contradicted or impeached the State's entire case. However, Daria's forensic interview was graphically detailed, the interview constituted her direct testimony, and on cross-examination, she reiterated the truth of the statements she made during the interview. To argue, as Holeyfield does, that any evidence that contradicted or impeached Daria's account necessarily contradicted or impeached the State's entire case (and would therefore lead to a reasonable probability of a different result) ignores all of the facts in the record that indicate her testimony was credible. We do not evaluate materiality of *Brady* evidence in a vacuum. *See Turner*, 582 U.S. at 324-25.

¶29 In the context of the entire record outlined above, Holeyfield failed to show that the suppressed evidence, whether considered independently or in the aggregate, is material to the defense. In our view, the arguably favorable statements contained in Kalen's and Ayla's interviews are "too little" and "too weak" in the context of the entire record to convince us that a reasonable probability exists that the jury would not have convicted Holeyfield if it had heard those interviews. *See id.* at 326.

**CONCLUSION**

¶30 Holeyfield failed to prove that the State violated the ***Brady*** rule. Though the statements were suppressed, they were not material. Accordingly, we affirm the judgment of conviction and order denying Holeyfield's postconviction motion.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.